UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| In re Peter Jokiel, Debtor. | Bankruptcy No. 09-B-27495<br>Chapter 7<br>Judge Manuel Barbosa |
|---|---|

**MEMORANDUM OPINION**

The factual background in this case is discussed in more detail in a memorandum opinion I issued on April 21, 2011 (ECF No. 124). In that opinion, I held that Mr. Jokiel's right to $699,023.33 of a severance payment was property of the estate, but reserved judgment on his contention that the payment was exempt under Illinois law as wages or as an "unemployment benefit" because he had not yet properly claimed such exemptions. Mr. Jokiel subsequently filed an amended Schedule C on May 2, 2011, claiming an exemption of 85% of the severance payment under 735 Ill. Comp. Stat. 5/12-803 (the "Illinois Wage Deduction Act") and an exemption of 100% of the severance payment under 735 Ill. Comp. Stat. 5/12-1001(g)(3) (the "Illinois Unemployment Benefit Exemption"). Mr. Jokiel's largest creditor, CNA Financial Corporation, filed an objection to Mr. Jokiel's claims of exemption on May 24, 2011, and the Chapter 7 Trustee filed his own objection to the claims of exemption on May 27, 2011. CNA Financial and the Trustee make three arguments: 1. that the Illinois Wage Deduction Act does not create an "exemption" for purposes of

the Bankruptcy Code,[1] 2. that Mr. Jokiel's severance payment does not constitute an "unemployment benefit" for purposes of the Illinois Unemployment Benefit Exemption, and 3. that Mr. Jokiel should be estopped from claiming an exemption in the severance payment because he intentionally concealed the severance payment when he filed his original bankruptcy petition and schedules.[2] As I discuss below, the first argument is purely a question of law, and I find that the Illinois Wage Deduction Act does not create an exemption for Bankruptcy purposes. However, the issue of the applicability of the Illinois Unemployment Benefit Exemption to the severance payment and the estoppel argument are fact-intensive questions, and I find I must take evidence on those two issues before ruling.

**A. The Illinois Wage Deduction Act**

Although one court has held that the Illinois Wage Deduction Act creates a bankruptcy exemption, In re Mayer, 288 B.R. 869 (Bankr. N.D. Ill. 2008) (Wedoff, J.), most other courts within Illinois to address the issue have found that it does not. In re Radzilowsky, 448 B.R 767 (Bankr. N.D. Ill. May 6, 2011) (Doyle, J.); In re Kapusta, 2011 WL 2173675 (C.D. Ill. June 2, 2011); In re Koeneman, 410 B.R. 820 (C.D. Ill. 2009); In re Thum, 329 B.R. 848 (Bankr. C.D. Ill. 2005). I join the majority in finding that the statutory provision does not create a bankruptcy exemption.

The Bankruptcy Code gives the states the power to pass laws creating exemptions from the bankruptcy estate, In re Meyers, 616 F.3d 626, 628 (7th Cir. 2010); 11 U.S.C. §522(b)(2), and gives them broad discretion over the exemptions they choose to make applicable in bankruptcy. In re

---

[1] They also argue that, even if the Illinois Wage Deduction Act created an exemption, it would not apply to lump sum severance payments. Because I find that the statute does not create an exemption for Bankruptcy purposes, I need not address this argument.
[2] The third argument appears only in CNA Financial's objection, not in the Trustee's objection.

Aldeir, No. 09-C-6932, 2010 WL 1656953 (N.D. Ill. Apr. 21, 2010). Illinois is among the states that has chosen to 'opt out' of the federal set of exemptions provided in Section 522(d) of the Bankruptcy Code and to instead require its residents to use its own set of state law exemptions in bankruptcy.

In interpreting state exemption statutes, a bankruptcy court must "discern the will of the state legislature: what was the exemption scheme that the legislature wished to make available to the state's residents as an alternative to the federal exemptions set forth in the Bankruptcy Code?" In re Geise, 992 F.2d 651, 658 (7th Cir. 1993). The state legislature is not required to use labels such as "exemptions," but at the same time it is "obliged to identify [such statutory provisions] with reasonable certainty as an exemption." Id. The primary guidepost in determining that a statute creates an exemption is that it provides "protection against all forms of process" rather than "prohibit only certain forms of judicial process." Id. Thus the Court of Appeals for the Seventh Circuit has found that a Wisconsin statute did not create a bankruptcy exemption for personal injury actions because the law only provided for protection from sequestration and because "at no place in its statutes, or in the case law interpreting its statutes is there more than a whisper of an echo of the Wisconsin legislature's intent, during the relevant time period, to afford such protection to a personal injury action." Id., 992 F.2d at 659.

In its statutory scheme, the Illinois legislature has at times clearly labeled statutory provisions as exemptions. Most notably, Article 12, Part 10 of the Illinois Code of Civil Procedure is entitled "Exemption of Personal Property" and provides that the enumerated list of personal property "is exempt from judgment, attachment, or distress for rent." 735 Ill. Comp. Stat. 5/12-1001.[3] Wages

---

[3] Another clearly labeled exemption is the "Exemption of Homestead" provided by Part 9 of the same article of the Illinois Code of Procedure, which provides that every individual is "entitled to an estate of homestead to the extent in value of $15,000" in property occupied as a residence and that "homestead and all right in and title to that homestead is exempt from

are not included in that enumerated list.

However, the Code of Civil Procedure is not the sole source of exemptions under the Illinois exemption scheme. For example, courts in this district have held that language in the Illinois Workers' Compensation Act that no "payment, claim, award or decision under this Act shall be assignable or subject to any lien, attachment or garnishment, or be held liable in any way for any lien, debt, penalty or damages" was sufficient to create a bankruptcy exemption, even though the statute did not use the word "exempt." In re McClure, 175 B.R. 21, 23 (Bankr. N.D. Ill. 1994) (Wedoff, J.) (citing 820 Ill. Comp. Stat. 305/21); see also, In re Dzielak, 435 B.R. 538, 549 (Bankr. N.D. Ill. 2010) (citing McClure). The McClure court emphasized that the language of the Workers' Compensation Act provided protection from all forms of process, and cited Illinois case law holding that a court cannot generally require workers' compensation benefits to be applied to the debts of a claimant, even when reduced to judgment. McClure, 175 B.R. at 23 (citing Mentzer v. Van Scyoc, 233 Ill. App. 3d 438, 599 N.E.2d 58 (Ill. App. Ct. 1992)).

The Illinois Wage Deduction Act provides that the "wages, salary, commissions and bonuses subject to collection under a deduction order, for any work week shall" not exceed 15% of the gross amount paid for that week. 735 Ill. Comp. Stat. 5/12-803. The statute makes no reference to exemption. Nor does the statute contain broad restrictive language such as in the Workers' Compensation Act. Instead it only limits collection under a deduction order. However, the court in In re Mayer found that the limitation in the Illinois Wage Deduction Act constituted an "exemption" because, as a practical matter, there were "no other statutory procedures allowing a

---

attachment, judgment, levy, or judgment sale for the payment of his or her debts or other purposes...." 735 Ill. Comp. Stat. 5/12-901.

greater amount of unpaid wages to be paid to satisfy a judgment." 288 B.R. 869, 873 (Bankr. N.D. Ill. 2008). The court reasoned that because "unpaid wages are neither in the possession of the debtor nor owned by the debtor" they were not subject to any form of execution under common law. Id. Further, the only other statutory enforcement mechanism that could apply to unpaid wages was a supplementary proceeding under 735 Ill. Comp. Stat. 5/2-1402(a) (often referred to as a 'citation to discover assets'); but that form of enforcement had a similar limitation. Id. at 872-73. 735 Ill. Comp. Stat. 5/2-1402(j) states, "This Section does not grant the power to any court to order installment or other payments from, or compel the sale, delivery, surrender, assignment or conveyance of any property exempt by statute from the enforcement of a judgment thereon, a deduction order, garnishment, attachment, sequestration, process or other levy or seizure." 735 Ill. Comp. Stat. 5/2-1402(j) (emphasis added). Therefore, the court reasoned that the legislature did not need to make reference to "assignment, attachment, levy, execution, and seizure," if it wanted to protect wages from all forms of process, since none of those other forms of collection would apply to unpaid wages. 388 B.R. at 872.

In contrast, the courts following the majority position first noted that the legislature did not evidence clear intent to exempt wages, since it neither labeled the wage deduction provision as an exemption nor used the broad language it used with other exemption statutes. Second, the majority courts emphasized the limited and transitory nature of the protection afforded by the statute. The Illinois Wage Deduction Act simply limits the amount of money a creditor can intercept directly from the employer. Nothing in the Illinois statutes, other than perhaps the limited 'wild-card exemption,' would protect any funds constituting wages as soon as they were paid to the debtor.

Thus, the court in Radzilowsky emphasized that, in contrast to other true exemptions, the Wage Deduction Act "does not 'forever sequester' the debtor's wages, or even his unpaid wages." 448 B.R. at 769; see also, In re Kapusta, 2011 WL 2173675 (same); In re Koeneman, 410 B.R. at 827 ("Once he deposits the wages into a bank account, however, the funds become fair game for creditors."). Each of the opinions in Radzilowsky, Kapusta, and Koeneman expressly addressed the arguments made in Mayer but rejected them.

I agree with the holdings in Radzilowsky, Kapusta and Koeneman, but I would further emphasize the history and policy behind the wage deduction limitation. In other words, it is not merely the fact that the protection does not extend to traceable proceeds of the property interest that makes the statute fail to constitute an exemption. Rather, it is that, in the language itself and in the language taken in context, the Illinois legislature has not demonstrated that it intended to create a full exemption in wages.

While the Illinois legislature certainly had the power to create a bankruptcy exemption for wages, the language and nature of the exemption do not clearly demonstrate such an intent. As the court in Koeneman noted, "the Illinois Legislature is quite capable of creating a general exemption when it chooses to and has not previously relied on implication to accomplish this, rather the Legislature has chosen to incorporate explicit language when a general exemption is intended." Koeneman, 410 B.R. at 826. In light of cases such as the Supreme Court's holding in Kokoszka v. Belford that the *federal* garnishment statute did not create an exemption under bankruptcy law, it was particularly incumbent upon the state legislature to demonstrate that it intended its state wage garnishment statute to create a bankruptcy exemption if it so desired. 417 U.S. 642 (1974); see also,

Smith v. Frazier, 421 B.R. 513, 517-18 (S.D. Ill. 2009) (citing Kokoszka and finding that the federal garnishment statute did not create a bankruptcy exemption for purposes of the post-1978 Bankruptcy Code). In contrast, workers' compensation benefits, at issue in McClure, are similar in nature to other assets which are provided an express exemption in the Illinois Code of Civil Procedure, such as disability payments and personal injury claims. 735 Ill. Comp. Stat. 5/12-1001(g)(3), (h)(4). Moreover, as this case demonstrates - with Mr. Jokiel attempting to exempt almost $600,000 as wages - had the Illinois legislature intended the act to create a bankruptcy exemption, one would have expected it to include the type of monetary cap or a limitation of the exemption to 'the extent reasonably necessary for the support of the debtor' as is found in many of the other Illinois exemptions, rather than a minor percentage limitation to 85%. See, e.g., 735 Ill. Comp. Stat. 5/12-1001(h)(4) (limiting exemption in payment on account of personal bodily injury to $15,000), 5/12-1001(h)(3) (limiting exemption in payment under life insurance contract "to the extent reasonably necessary for the support of the debtor or a dependent of the debtor"). Thus in this case, Mr. Jokiel seeks to exempt an amount almost 40 times the limit on a homestead exemption or personal injury claim exemption. Treating the Wage Deduction Act as a bankruptcy exemption without such limitations would be particularly troublesome since the term "wages" under the statute has been interpreted broadly to cover not only salary, but bonuses, commissions, and even accounts receivables. California-Peterson Currency Exchange, Inc. v. Friedman, 316 Ill. App. 3d 610, 736 N.E.2d 616 (Ill. App. Ct. 2000) (compensation under an independent consulting contract); In re Christy, 306 B.R. 611 (Bankr. C.D. Ill. 2004) (accounts receivable for services provided by debtor-physician); One CW, LLC v. Cartridge World N. Am., LLC, 661 F. Supp. 2d 931, 939-40 (N.D. Ill.

2009) (monthly royalty payments to a corporate debtor). Therefore, based on the history of the exemption scheme and compared to the exemption scheme as a whole, it is easier to believe a legislature intended to exempt workers' compensation benefits than wages.

Moreover, the Illinois Wage Deduction Act serves a different purpose and policy than the other true exemptions. As noted in Koeneman, the "purpose of garnishment caps is to protect a wage earner living paycheck to paycheck from losing his entire earnings so that he is left destitute with no ability to pay necessary family living expenses." 410 B.R. at 827 (quoting Thum, 329 B.R. at 855). Also, because the intercepted funds come directly from the employer rather than from the debtor, the limitation can protect the debtor from undue surprise, by limiting the amount that can be collected in that way. But, once the wages are received or deposited in a bank account, the wages would no longer be protected. Once the funds are in the hands of the debtor, creditors can collect on them through a citation proceeding or other form of process. The statute does not allow an insolvent person to "accumulate and shelter funds in a bank account simply because they derive from wages." Koeneman, 410 B.R. at 827 (quoting Thum, 329 B.R. at 855). Given the policies behind the statute and the unique nature of unpaid wages, it is not unusual that the Illinois legislature would have intended the Wage Deduction Act to provide only limited protection rather than the full and permanent protection of a bankruptcy exemption. As the court in Koeneman noted, to "find that the additional wages earned but not paid are 85% exempt under the IWDA would be to create a loophole in the carefully drafted bankruptcy exemptions and allow debtors to shield any number of thousands of dollars from the bankruptcy estate simply by strategically filing their bankruptcy petition the day before a paycheck or year end bonus was due to be paid." 410 B.R. at 827. If the Illinois legislature

Document  Page 9 of 12

wants a bankruptcy exemption for unpaid wages, it can draft a clearer exemption.

### B. Illinois Unemployment Benefit Exemption

735 Ill. Comp. Stat. 5/12-1001(g)(3) provides an exemption for a debtor's right to receive "a disability, illness, or unemployment benefit." While "unemployment benefit" might first appear to apply only to state or public assistance, such public assistance is already covered by section 12-1001(g)(1), which provides an exemption for a debtor's right to receive "a social security benefit, unemployment compensation, or public assistance benefit." Thus, the term "unemployment benefit" in section 12-1001(g)(3) has been interpreted as "a more general term that refers to a payment on account of or attributable to the status of being unemployed or having lost one's job [w]ith no limitation on the source of the benefit." In re Rock, No. 04-83722, 2005 WL 2061045 (Bankr. C.D. Ill. Apr. 25, 2005); see also, In re Bowen, 458 B.R. 918, 923 (Bankr. C.D. Ill. Sept 23, 2011) (adopting reasoning in Rock). The legislative history for the federal exemption in 11 U.S.C. § 522(d)(10)(C), which is nearly identical to 735 Ill. Comp. Stat. 5/12-1001(g)(3), indicated that the provision was intended to exempt "certain benefits that are akin to future earnings of the debtor." In re Haynes, 146 B.R. 779, 780 (Bankr. S.D. Ill. 1992) (quoting H.R. 595, 95th Cong., 1st Sess. 361-62 (1977), U.S. Code Cong. & Admin. News 1978, 5787, 6316-18).

Therefore, the court in Rock held that a severance payment by an employer could, at least in some instances, constitute an exempt "unemployment benefit." However, the court emphasized that the "holding should *not* be construed as a general determination that severance pay will always constitute an unemployment benefit. The issue is one to be decided on a case-by-case basis on the facts of each case." 2005 WL 2061045 at *4, n.5.

However, the severance agreement and facts in this case are very different from the facts in In re Rock. In Rock, the severance agreement was in connection with a plant closing and was negotiated between the company and a union representing numerous workers. The court found particularly relevant that the severance package included job search assistance and other evidence that the "parties to the Agreement intended that the Separation Package would provide financial assistance during a time of anticipated unemployment." 2005 WL 2061045 at *4. The court was concerned that the severance pay was not conditioned upon the worker being unemployed for any length of time, but emphasized that it was "necessary to look to the intent of the parties to the Agreement," and found that where a union had negotiated on behalf of numerous "similarly situated blue collar employees" it was not reasonable to treat each employee differently based on each person's job prospects. Id. The court also had some concern that the agreement provided increased severance payments based on seniority, but found that such increase could "nevertheless be an unemployment benefit designed to compensate for the increased reliance by and possibly decreased employment prospects for older employees." Id.

In contrast, numerous facts alleged in the pleadings in this case would weigh against treating this severance payment as an "unemployment benefit." Mr. Jokiel apparently received the payment three months before he actually ceased working for the company. The amount of compensation was apparently unrelated to the length of time Mr. Jokiel might actually remain unemployed. Mr. Jokiel was an executive at the company, rather than one of many blue collar workers represented by a union, but the agreement did not appear tailored in any way to his actual job prospects. Mr. Jokiel suggested in his pleadings on other matters relating to the severance right that all or a portion of the

severance compensation may have been consideration to induce him to waive claims against the company or consideration for a non-compete provision rather than 'financial assistance during a time of anticipated unemployment.' Also, because Mr. Jokiel was a high-level executive at the company, the severance right may have constituted what is "commonly referred to as a 'golden parachute' in the lexicon of corporate executives and lawyers alike, [which] serves both to deter hostile takeover attempts and to retain key managers," In re Crystal Apparel, Inc., 207 B.R. 406, 408 n.2 (S.D.N.Y. 1997), rather than unemployment assistance.

However, since the key issue is the intent of the parties at the time they entered into the employment agreement and at the time they entered into the severance agreement, I feel an evidentiary hearing is required. In particular, there appear to be disputes as to material facts, such as what power Mr. Jokiel had to control the merger which led to his right to severance, and whether he was terminated or voluntarily resigned. It is also unclear from the pleadings whether a change in control was sufficient under the employment agreement to allow Mr. Jokiel to voluntarily resign and receive the severance, or if he also had to show an independent "good reason" to resign. These and other factual disputes require an evidentiary hearing to resolve.

### C. Fraudulent Concealment of Property

The Seventh Circuit Court of Appeals has held that "concealment of an asset will bar exemption of that asset." In re Yonikus, 996 F.2d 866, 872 (7th Cir. 1993) (quoting In re Doan, 672 F.2d 831, 833 (11th Cir. 1982)). The fact that a debtor subsequently amends his schedules to disclose the previously omitted asset will not necessarily entitle him to claim an exemption. As the Yonikus court noted, "[i]f debtors could omit assets at will, with the only penalty that they had to file an

amended claim once caught, cheating would be altogether too attractive." Id., 996 F.2d at 872. However, the Yonikus exception to the liberal rule permitting amendment applies only where it is shown by clear and convincing evidence that the debtor intended to defraud creditors by concealment of the asset. Id., 996 F.2d at 871-872 ("amendment may be denied upon a clear and convincing showing of bad faith by the debtor or prejudice to the creditors").

CNA Financial argues that Mr. Jokiel intentionally failed to disclose his right to the severance payment in his bankruptcy schedules. Mr. Jokiel argues that he did not intentionally conceal the right, that he was not reasonably certain to receive severance as of the time of the petition, and that he made the Trustee and others aware of the right and the payment shortly after he received the payment. The debtor's intent is an issue of fact, and given the dispute over facts demonstrated by the pleadings, it appears an evidentiary hearing is required.

## CONCLUSION

For the foregoing reasons, the Court will grant and sustain the objection to the Debtor's claim of exemption under 735 Ill. Comp. Stat. 5/12-803, but will set an evidentiary hearing on the objection to claim of exemption under 735 Ill. Comp. Stat. 5/12-1001(g)(3) and on the applicability of the "Yonikus exception" by a separate scheduling order. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: January 5, 2012

The Honorable Manuel Barbosa
United States Bankruptcy Judge